IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
(HONORABLE MARY KAY VYSKOCIL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **Case. No. 22 CR 510 – 001 (MKV)** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **SENTENCING MEMORANDUM** |
| DAVID LEE STONE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## Introduction

David Lee Stone comes before the Court to be sentenced for criminal conduct that stands in stark contrast to the exemplary life he had led prior to his commission of his offense. He fully recognizes the seriousness of his crime and the incongruity between his illegal actions and the values instilled in him by his family and his deeply held religious faith.

While the defense freely concedes the severity of his offense, the combination of extraordinary mitigating factors in this case nevertheless weighs in favor of a non-incarceratory sentence. The Probation Department has recognized that those factors warrant a substantial downward variance from the applicable Guideline range. Although Probation concludes that some imprisonment should still be imposed, due to the nature of Mr. Stone's criminal conduct, that recommendation was made without the benefit of additional relevant information regarding the

-1-

physical and neuropsychological impact of the traumatic brain injury (TBI) Mr. Stone sustained in a 2020 car accident involving him and his family.

In the nine months since Mr. Stone's arrest, he has also demonstrated extraordinary acceptance of responsibility. Rather than simply following his release conditions and staying out of trouble, he has tried to assist not only the United States Attorney's Office in its criminal investigation, but also the United States Securities and Exchange Commission (SEC), in connection with its pending civil lawsuit seeking disgorgement of the proceeds from Mr. Stone's deceptive trading practices.

For the reasons set forth below, the defense respectfully recommends the Court sentence Mr. Stone to five (5) years of probation, with the first 24 months to be served on home detention. The defense further recommends the Court impose the additional requirement that he perform 400 hours of community service during each of those five years.

This proposed sentence would satisfy the "parsimony principle" of § 3553, for it would be "sufficient, but not greater than necessary" to satisfy the statute's stated purposes of sentencing. The Second Circuit has observed that "[i]f a district court were to explicitly conclude that two sentences equally served the statutory purposes of [section] 3553, it could not, consistent with the parsimony clause impose the higher." See United States v. Ministro-Tapia, 470 F.3d 137, 142 (2d Cir. 2006).

### 1.   **David Stone – Personal History and Characteristics**

The presentence report in this case provides a detailed and thorough description of those aspects of Mr. Stone's character and background that are relevant to the Court's exercise of its sentencing discretion under § 3553. Attached to this memorandum are numerous letters of support from Mr. Stone's family, friends, and former colleagues. Mr. Stone has also written his own letter, in which he candidly acknowledges how his criminal conduct marked a total deviation from the core values he learned from his family and his faith as a child, and which have been the bedrock principles on which he has ordered his adult life: "God, family, work and community." Exhibit C, p. 3.

The many letters of support similarly recognize that Mr. Stone's criminal conduct is not consistent with his character. One of those letter writers, close friend Jennifer Robson, observes, "[W]ho I know him to be is this: A loving husband to Gwen, a caring father to their five children, a faithful member of his church, and a loyal friend who would help anyone who needed it." Exhibit E, p 33.

Many of Mr. Stone's supporters note that he demonstrates his love for his family through his actions – by giving his time and attention to help Gwen, his wife for more than 16 years, with the household chores, to pray together as a family, or to play with his children:

> I have had numerous opportunities to interact with Mr. Stone and his family and have observed him as a man, husband, and father. Mr. Stone is a quiet spoken man who deeply loves his wife and children. I've seen him on his knees in a circle of children engaged in a toy, at a table as they draw and create, holding a baby as he pats its bottom into sleep, he is an available father. He engages his children in their

activities and stages of development, he has time, for them. He is patient with them, and I have never seen him angry with them, frustrated of course, but never unkind.

Exhibit E, p. 3.  Gwen echoes these observations in her own letter to the Court and in the Presentence Report.  Exhibit D, p. 1; Presentence report, p. 15.

The depth of Mr. Stone's religious faith is similarly reflected in his selflessness towards others. After Mr. Stone and Gwen were married in 2007, Mr. Stone agreed to postpone completion of his studies at Northwest Nazarene University and to accompany Gwen to Oregon, to care for her very ill mother and grandmother.  Gwen notes that he did whatever needed to be done – no matter how unpleasant the task might be – without the slightest complaint.  Exhibit D, p. 1. There are many other examples of Mr. Stone demonstrating willingness to sacrifice his own needs and desires for the benefit of others – even total strangers.  For example, Jennifer Roberson describes how Mr. Stone and Gwen went with her and other NNU students to Louisiana where they helped residents displaced by Hurricane Katrina.  Exhibit E, p. 33.

The most obvious example of Gwen and Mr. Stone practicing what they preach is their decision to move their family from the United States to Romania to answer God's call for them to serve as missionaries.  Few individuals would be willing to relocate five children from their home country to another continent. Alice Nelson, who has been a family friend of Mr. Stone and Gwen for many years, puts it simply: "They just don't profess to be Christian, they live their faith on a daily basis." Exhibit E, p. 51.

A.      **Traumatic Brain Injury**

The majority of support letter writers emphasize the significance of the catastrophic car accident in 2020 that is described at length in the presentence report.  Presentence report, pp. 16-18.   Thankfully, Mr. Stone and his family members all survived; however, both Gwen and Mr. Stone were severely injured. Shortly after being discharged from the hospital stay for the injuries she suffered in the accident, Gwen had to be readmitted due to the premature birth of their son, whom they named T█████ M██████ S███, after he had to spend 47 days in the Neonatal Intensive Care Unit before Gwen and Mr. Stone could take him home.

Due to the medical records' description of the severity of Mr. Stone's TBI, the defense contacted Dr. Zimmerman of the Idaho Brain & Body Institute to solicit his input as to any lingering effects. Dr. Zimmerman wrote a letter, in which he describes how the TBI would create an "increased risk of negative physical, emotional, and cognitive consequences," thereby increasing Mr. Stone's risk of serious harm in a prison setting.  Exhibit B, p. 1.  Gwen notes in her letter that she was told by one of the medical providers that if Mr. Stone hit his head, he could die or be severely injured.  Exhibit D, p. 4.  Even when the Sentencing Guidelines were mandatory, they recognized that "[a]n extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment."  U.S.S.G. § 5H1.4.

In addition to providing his opinion as to how Mr. Stone's TBI renders him highly vulnerable to severe harm in a prison setting, Dr. Zimmerman also addresses

the possibility that it also could have contributed in some way to the commission of his offense. He notes that "[w]ith these injuries we often see decision making impacted, specifically with more impulsive behaviors." Exhibit B, p. 1.

Consistent with Dr. Zimmerman's observations, Gwen describes in her letter how Mr. Stone's "mental and emotional capacity changed" in the wake of the 2020 car accident and resulting injuries. Exhibit D, p. 6. She opines that Mr. Stone's TBI may have affected Mr. Stone's judgment in a way that contributed to his commission of the offense: "Based on my observations of him after the terrible car crash, I believe he suffered from physical and behavioral changes that made him stressed about the family's financial security and led him to act in ways he wouldn't have before the accident." Id. at 9.

To further explore the issue raised but not resolved by Dr. Zimmerman regarding whether the TBI from the car accident could have contributed in any way to Mr. Stone's commission of his crime of conviction, the defense retained the services of psychologist, Clay Ward, Ph.D. See Exhibit A. Dr. Ward conducted a neuropsychological examination of Mr. Stone; his findings are set forth in his attached report. Id.

Dr. Ward's report notes that Mr. Stone's medical records show that he was diagnosed on June 29, 2020 with a "diffuse traumatic brain injury with dysphagia, impulsivity, impaired mobility, cognitive dysfunction and neurobehavioral dysfunction." Exhibit A, p. 1. Approximately two weeks later, Mr. Stone was having "serious difficulty concentrating, remembering and making decisions." Id. at 1-2. At the time of his discharge, he was still having "neurocognitive deficits in

concentration, memory and reasoning," as well as "problems with impulsivity and decreased awareness." Id. at 2.

Based on the results of the neuropsychological tests administered, Dr. Ward does not conclude that Mr. Stone's TBI rendered him mentally incompetent. However, Dr. Ward does conclude that the injury to Mr. Stone's brain likely contributed to his commission of the offense:

> The traumatic brain injury David Stone experienced did not likely cause the legal problems David Stone is currently facing in terms of him not being able to appreciate the wrongness of his conduct or an inability to conform his behaviors to legal standards. However, there may have been a combination of neuropsychological factors contributing to his mental state and actions following the traumatic brain injury he experienced in 2020. *At the time of his rehabilitation, he was noted to be impulsive and to have impaired decision skills. The current neuropsychological evaluation indicates he still has some problems with impulsivity and difficulty inhibiting responses. He also still has some problems with his decision-making skills. The fact that he still has problems in these areas that were noted during his traumatic brain injury rehabilitation strongly indicates that his problems making decisions and difficulty with impulse control were significant in 2020 and 2021.*
>
> David Stone stated he was working on a program to trade stocks quickly on information prior to experiencing the traumatic brain injury in 2020. He stated after the accident he became more fixated and obsessed with his ideas on trading stocks, which is consistent with perseveration and lack of mental flexibility following a traumatic brain injury. *His problems with poor decision making, impulsivity and difficulty inhibiting responses also may have contributed some to how his approach to trading stocks crossed the boundary into becoming an illegal enterprise. Impairment in self-direction is common following a diffuse traumatic brain injury.*

Exhibit A, p. 10.  Dr. Ward's findings are consistent with both Dr. Zimmerman's and Gwen's observations about changes in Mr. Stone's personality.

Mr. Stone's impaired decision-making and impulsivity from the TBI arose around the same time that he shifted from trying, and failing, to create a program that could capture The Motley Fool's stock picks quickly enough to profit from the information to using deceptive means to access that material non-public information. Given that Mr. Stone had started having shifts in his personality around this time, it is entirely reasonable to conclude that the effects of his TBI played a role in his offense conduct.

Thus, while the defense does not contend that Mr. Stone's TBI eliminated his culpability for his criminal conduct, it certainly mitigates it extensively. If Mr. Stone did not have full control over his cognitive faculties, he should not receive the same punishment as someone unencumbered with such a limitation.

### B.     David Stone's Letter to the Court

In his letter to the Court, Mr. Stone does, in fact, indicate that his TBI affected his outlook on the future. Exhibit C, pp. 3-4. He could tell that "the near death experience and the brain trauma changed me. I was worried about the future, and my judgment was not the same." As a result, he started trying to devise ways to learn The Motley Fool's confidential stock picks, initially through legal means, but eventually by employing the deceptive means at the heart of his offense.

Mr. Stone's letter also expresses his remorse for his actions and his recognition of the gravity of his criminal conduct, as he explains how his actions contradicted all of the values he has held dear:

> Your Honor, my parents taught me foremost to love and honor the Lord. They also taught me to love our country, respect authority and

> follow the law. They did not teach with words alone but with the
> example of their lives in everything they did. I am grateful for the good
> direction and guidance that my parents, pastors and other mentors
> gave me as a young person. There is no excuse for my illegal conduct.
> My unlawful actions were a complete departure from everything I was
> taught.

Mr. Stone deeply regrets having strayed from the principles that have informed his

life since he was a child.  However, his lack of any criminal history shows that he

will never again break the law.

### 2.  Nature and Circumstances of the Offense

The defense agrees with the summary of the offense conduct, which is found

at pages 5-10 of the presentence report.  In arriving at the conclusion that while the

various mitigating factors of this case warrant a substantial downward variance,

Probation was compelled to recommend the Court impose some imprisonment due

to the length of time Mr. Stone continued to make trades by deceptively obtaining

The Motley Fool's stock picks, which produced a substantial amount of illegal

proceeds.

While Probation reasonably identifies these as aggravating factors, Mr. Stone

has demonstrated an extraordinary level of acceptance of responsibility that weighs

against the conclusion that only a sentence of imprisonment can satisfy the §

3553(a)(2) factors.  Following his arrest, Mr. Stone could have invoked his Miranda

rights and declined to speak with the FBI agents who sought to interview him.

While it ultimately may have been possible for the government to prove his guilt

beyond a reasonable doubt at trial, Mr. Stone's silence would have made it much

more difficult.  Instead, he agreed to talk with the agents and answered their

questions for well over an hour without an attorney present. In doing so, he filled in the gaps in the government's investigation and substantially incriminated himself.

Beginning with his decision to voluntarily speak with the agents, Mr. Stone has attempted to cooperate as much as possible with the government's investigation and prosecution of him. After he was released on pretrial conditions, Mr. Stone agreed to participate in a proffer session at the United States Attorney's Office in an effort to qualify for a substantial assistance departure under U.S.S.G. § 5K1.1. Mr. Stone flew from Idaho to New York City to meet with counsel for the government and the investigating FBI agents. He also did not object to the participation of counsel for the SEC who were handling the separate civil suit.

For two days, Mr. Stone met with the government and answered every question he was asked. The government was primarily interested in the potential criminal liability of a friend with whom Mr. Stone had been sharing The Motley Fool's stock picks. After meeting with Mr. Stone, the government decided that his information was not sufficient for them to offer him a cooperation agreement. However, government counsel agreed that Mr. Stone had been truthful and credible during the meetings.

Despite the government's unwillingness to grant him the § 5K1.1 motion, Mr. Stone nevertheless quickly agreed to resolve his criminal case by accepting a resolution that did not even require the government to present his case to a grand jury. He agreed to plead guilty without even having had the opportunity to review discovery following the issuance of an indictment.

Mr. Stone has not only assisted the government in this criminal case to the

best of his ability, but he has also cooperated with SEC counsel in the pending civil case. Mr. Stone quickly agreed to admit his liability in the civil case, leaving unresolved only the determination of the amount of any possible disgorgement and any civil penalties that could be imposed.

On December 19, 2022, Mr. Stone and undersigned counsel met with attorneys for the SEC in Denver. In connection with that meeting, Mr. Stone did not require the SEC to grant him the immunity that would normally accompany a formal proffer session. Instead, he agreed that SEC counsel could simply conduct an unprotected interview, thereby simplifying the process for them. He met with three SEC attorneys and spent roughly six hours responding to every question he was asked. He did so without any guarantees or promises that he would receive a benefit for doing so. To date, SEC counsel have not indicated that they had any concerns regarding the veracity of the information Mr. Stone provided in that meeting.

Mr. Stone has also complied with the requests by SEC counsel that he identify the various accounts where proceeds from his illegal trades were located. As with the criminal case, he has done everything possible to assist SEC counsel in accomplishing the goals of that civil litigation expeditiously.

It also bears mentioning that the other defendant and relief defendants in the civil case have filed motions seeking the dismissal of the SEC's complaint on the grounds that it does not state a case against them. Mr. Stone, however, has not offered any resistance in either the civil or criminal cases relating to his use of The Motley Fool's material nonpublic information to conduct trades.

### 3.      Section 3553(a)(2) factors

While Probation concluded that the duration of Mr. Stone's criminal conduct and the amount of profits it generated required some that some incarceration be imposed in the Court's sentence, its recommendation of 18 months was far below the low end of the applicable Sentencing Guideline range.  Furthermore, as previously noted, that recommendation was made without the benefit of the information contained in the neuropsychological evaluation conducted by Dr. Ward and the letter from Dr. Zimmerman regarding the increased risk of harm that Mr. Stone will face if he is sent to prison.  The combination of compelling mitigating factors that have been identified in the presentence report, the letters of support, and this memorandum makes a sentence of imprisonment unnecessary to reflect the seriousness of the offense, promote respect for the law, or provide for just punishment.

A sentence of probation with conditions requiring Mr. Stone to serve 24 months on home detention and 400 hours of community service would be sufficiently punitive to meet the § 3553(a)(2) goals.  Furthermore, the forfeiture and restitution obligations will impose a heavy financial burden that increases the punitive nature of a sentence of probation.  See United States v. Schrader, 11-CR-13 (E.D. Wis January 23, 2013) (variance from 57-71 month Sentencing Guideline range to a three-year term of probation satisfied § 3553 based, inter alia, on the government's forfeiture of defendant's firearms worth $500,000.00, which added to the "punitiveness" of his sentence).

The Supreme Court has recognized that a prison sentence is not always necessary to satisfy the goals of just punishment and promoting respect for the law. In <u>Gall v. United States</u>, 552 U.S. 38, 54 (2007) the Court found support for the district court's observation that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."

With respect to specific deterrence, Mr. Stone has been in the community for the last nine months without incident. His full compliance with his release conditions for an extended time combined with the lack of any prior criminal history and the lifting of the veil of secrecy under which he committed his offense clearly establish that a prison sentence is not required either to deter him from future criminal conduct or to protect the public.

As for general deterrence, any prospective white collar criminal reviewing sentences for such offenses could not possibly draw any conclusions from a sentence of probation in this case given that its unique facts set it so far apart from the typical white collar insider trading or misappropriation case. To the extent there could be any general deterrent effect from the Court's sentence in this case, this factor is outweighed by the other factors that make a sentence of imprisonment unnecessary to accomplish the statutory sentencing goals.

## Conclusion

For the foregoing reasons, the defense respectfully requests that the Court impose a sentence of five (5) years of probation, with the first 24 months to be served on home detention, and with the additional requirement that Mr. Stone perform 400 hours of community service during each of those five years.

Dated: February 4, 2023          Respectfully submitted,

/s/ Thomas Monaghan

Thomas Monaghan
Aaron Mysliwiec
Attorneys for Defendant
DAVID LEE STONE